IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHARNAE WHITE,                    )    CASE NO. 1:04CV1380
                                  )
            Plaintiff,            )
                                  )    MAGISTRATE JUDGE HEMANN
      v.                          )
                                  )
DRS. CAMM & GOLIAN,               )
D.D.S., INC., et al.,             )
                                  )    **MEMORANDUM OF OPINION**
            Defendants.           )

       This matter is before the court on consent of the parties.  Pending is the motion for

summary judgment filed by defendants, Drs. Camm & Golian, D.D.S. Inc. ("Camm & Golian"),

Daniel Camm ("Camm"), and Mark Golian ("Golian") ("Defs.' mot."; Docket #16).   Plaintiff,

Charnae White ("White"), opposes this motion ("Pl. opp."; Docket #20).  For the reasons set

forth below, the court grants defendants' motion.

                                          I.

       The court construes the facts, as it must, in the light most favorable to the party

opposing the motion.   White admits, or does not deny, the following facts.

       Camm and Golian practice dentistry in Brunswick, Ohio as Camm & Golian.  Camm

& Golian hired White as a temporary dental assistant to Golian in March of 2002.  White was

then the only African-American employee in the office.   While White was officially Golian's

assistant, she occasionally assisted Camm as well.   Approximately one week after White

began her temporary employment, Golian offered her a regular, full-time position as a dental assistant.  White accepted the offer.

White alleges that early in her employment she experienced hostile treatment from Donna Mace ("Mace"), Camm's assistant, and Laura Edmisten (Edmisten"), Golian's assistant.  According to White, this hostility included Mace's speaking harshly to White and locking the employer entrance in her face.  White also alleges that in late summer or fall of 2002 Mace told Edmisten, "Here comes the office slave," which White understood as a racial slur.

White gives two versions of what happened next.  In her response to defendants' interrogatory requests, White gives this account:

> I told Linda Hanson (dental/lab assistant) about what Donna said.  I did not tell anyone else.  Linda came back to me and told me she had spoken to Dr. Camm in order to help.  That's when Dr. Camm took me by the hand with Linda right behind me and led me to his office, He [sic] showed me a picture of Christ washing the feet of his disciples and asked me to read the scripture beneath the picture and said, "We are all servants of each other."

Plaintiff's Responses to Defendants' First Set of Interrogatories and Request for Production of Documents, attached to Reply (Docket #22), p. 1.  In her supporting affidavit White testifies as follows:

> I brought this racial invective to Dr. Camm's attention and made it clear to him that I believed Mace and Edmisten were subjecting me (by way of the racist "slave remark and their general hostility toward me) to race-based discriminatory workplace hostility.  My coworker Linda Hansen informed me that she also told Camm about the remark. . . . Dr. Camm's "response" to my complaint about the "office slave" remark  (and Mace's and Edmisten's overall different treatment of me, compared to the other, white people in the office) was to advise me that, according to Jesus, we are all slaves; and he showed me a picture in his office depicting Jesus washing someone's feet.  Camm also stated that he would not take action in response to my complaint, because he felt that I should take my concerns directly to Mace and Edmisten.

2

Affidavit of White ("White aff."), attached to Pl. opp., ¶¶ 5-6.  According to White, Camm took no further action in the matter.

White also alleges that she was subjected to the following instances of harassment while employed at Camm & Golian:  (1) Mace sprayed a substance in White's hair, causing bumps on her scalp;[1] (2) someone cut the straps on three of White's purses; (3) someone flattened one of White's tires with a nail; (4) White's food, safety glasses, hairbrush, shoes, and assistant's chair were repeatedly moved, damaged or destroyed; (4)  Judy Delorm ("Delorm") repeatedly pinched White and commented about her "big butt";[2] and (5) someone put acrylic powder in White's coat.  White asserts that she did not report the incidents of harassment to her employers because Camm's response to the "office slave" comment showed her that Camm & Golian had no interest in doing anything about such behavior.

During a monthly staff meeting on January 28, 2003, White announced that dental

---

[1]White has testified both that Mace sprayed something in her hair once and that Mace sprayed something in her hair twice.  *Cf.* Brunswick Police Department Report ("Report"), Affidavit, Exhibits, and Deposition Testimony in Support of Defendants' Motion for Summary Judgment ("Exhibits"; Docket # 17), Exh. 3, p. 1; Diary of Charnae White ("White diary"), Exhibits, Exh. 2, p.1; ; and Deposition of White ("White depo."), Exhibits, Exh. B, pp. 104-07 *with* White depo. at 102-05.  When asked to reconcile her differing accounts, White said that she had decided to "leave the [first] incident alone" because of Camm's response to the "office slave" remark, because she needed the job, because she did not want to stir anything up, and because the hairpiece ruined by the first incident was a cheaper one.  White depo. at 105, 106-07.

[2]This incident did not appear in White's answers to defendants' interrogatories even though White regarded this statement as a racist remark and she was asked in her interrogatories to describe any racist commentary made to her and to describe any instance of unwanted touching in the workplace.  *See* Interrogatorries at 2.  The incidents also do not appear in the diary which White asserts she kept during the month or so before January 28, 2003.  *See* White diary at 1-3.  White did not keep a diary at any other time in her adult life.  White depo. at 69-70.

assistants Mace and Edmisten had assaulted her and vandalized her property.  White described incidents in which Mace and Edmisten placed acid in her hair, planted acrylic powder in her coat hood, cut three of her purse straps, flattened her car tire with a nail, placed an unknown substance in her shoes which caused itching and discolored her socks, and stole food that she brought to work.  When Camm and Golian asked White why she thought anyone would do these things to her, she asserted that the alleged perpetrators were jealous.  According to White, Camm told her after the meeting, "You're a Christian–you're supposed to forgive, *not* bring this up."  White aff. at ¶11.

Camm and Golian began investigating White's allegations by interviewing White.  White contends that Camm and Golian never asked her to produce physical evidence which would support her claim.  She does not deny, however, that defendants told White to report to them immediately any further instances of harassment.  Affidavit of Golian ("Golian Aff."), Exhibits, Exh. A, p. 4.  Defendants also interviewed all other members of the staff about White's allegations.  White alleges that on January 29, 2003 Golian told White to file her claims with the police.

On January 29, 2003 White met with the Brunswick Police Department and filed a complaint against Mace and Edmisten alleging ethnic intimidation, assault, and criminal damage or endangering.  Golian and Camm gave written statements to the police, reporting that they had met with Mace and Edmisten after the staff meeting the day before and that both had denied White's allegations.  Mace and Edmisten gave statements to the police in which they denied White's allegations.  The records of the police investigation indicate that on January 30, 2002 Robert Safran ("Safran") of the Brunswick Police Department spoke to

4

White and asked if she had "any items of evidentiary value which she believes could substantiate her claims." Report at 15. White replied that her purses were being repaired, she was unsure as to whether she had a repair receipt which would show nail damage to her tire, and she had replaced the damaged shoes. White did give Safran the name of her hairdresser so that he could interview her about damage to White's hair. Safran concluded by telling White that if she had any items she believed were "of evidentiary value" or could "corroborate her claims" to contact him or the Brunswick Police Department. *Id.* at 16.

White was told to contact the prosecutor if she wanted to pursue the matter. White asserts that she tried repeatedly to meet with the prosecutor but he was unavailable.

A later interview with White's hairdresser indicated that White had some sort of hair problem on or about February 1, 2003, including matted hair and a sore on her scalp. The hairdresser did not think, however, that the problem was caused by acid.

According to White, on about February 4, 2003 someone came up behind her and sprayed pepper spray on the back of her neck.[3]  White continued to work the rest of the day. Later that day the skin on the back of White's neck began to itch. She did not testify that the skin was burning at any time. White did not report this incident to anyone at the office at that time or ask if anyone at the office had seen anything. Instead, she went home and called Golian later in the evening to report the incident. White did not report the incident earlier because she was upset, it happened near the end of the day, and defendants had not

---

[3]White was not only convinced that the substance used to attack her was pepper spray but that it was her own pepper spray. White kept a container of spray on a key ring which she left in the staff room, and she believes that this was the pepper spray used to attack her. White depo. at 115-17.

responded to her previous complaints.  She does not deny that defendants cancelled all patient appointments for the next day to investigate her claim, not does she deny the following:

> We spoke to Donna Mace as well as each of our employees who had been working in the reception area in proximity to Ms. White on the afternoon of February 4.  None of them could provide any facts tending to corroborate Ms. White's description of a pepper spray attack on her person that afternoon.  No one saw, heard, felt, or smelled anything out of the ordinary in the reception area that afternoon.  None of them heard Ms. White say anything about being attacked or, indeed, experiencing the slightest discomfort.  None of them saw Ms. White do anything unusual any time before she left work that day.[4]

Golian Aff. at 4. White did not report the pepper spray incident to the Brunswick Police Department until February 10, 2003, six days after it allegedly occurred.

On or about February 5, 2002 White met with the Akron office of the Ohio Civil Rights Commission ("OCRC") about her belief that she was being racially discriminated against at Camm & Golian.  The Akron OCRC told White that the Cleveland office of the OCRC had jurisdiction over her complaint and that she should file her complaint with that office.  The next day White told Golian of her meeting with the OCRC.  According to White, Camm immediately suspended her from work because he was worried that she would confront Mace about the

---

[4]

White's deposition testimony supports the accuracy of this account.  White testified as follows:

Q: [D]id you say anything to the people who were in the room with you when this happened, that, hey, I have just been pepper sprayed, or did you see what just happened to me, or anything of the kind?
A: No.
Q: Did you make any complaint to anyone who was in the room with you when you were sprayed with the pepper spray of discomfort or not feeling right?
A: No, I don't remember.

White depo. at 117-18.

6

latest incident.[5]

On February 11, 2003 Camm & Golian sent a letter to White terminating her employment for cause, effectively immediately.  The letter stated in relevant part:

> At a general staff meeting on January 28, 2003, in the presence of co-workers and us, you made several serious accusations that certain co-workers had intentionally committed assault and battery upon you at the offices of the Company, and that hateful things were done to you by two specific co-workers. You confronted these co-workers in the presence of the staff, accusing them of being untruthful. You further accused the Company of doing nothing to stop these incidents, despite your never having reported a single one of these incidents before that day.  When asked by us, you stated that their motivation was that they were "jealous" of you.

> On Wednesday, February 5, 2003, you further alleged that one of the same co-workers had committed "another" intentional assault and battery upon you during working hours.  Taken together, these allegations of January 28 and February 5 included claims that co-workers had put acid in your hair, had placed acrylic powder in your hood, had damaged your personal property, and had sprayed you with pepper spray.

> Investigation of each of your allegations has failed to uncover evidence that you were the victim of any assault, battery, or vandalism by any Company employees, and you have failed or refused to provide any evidence.  Moreover, you [sic] conduct has disrupted the office and jeopardized its professional working relationships while defaming the employees who were targets of the unsubstantiated charges you made. You have given us no indication that you are going to stop making these allegations, nor are you going to cooperate with us in the investigation of them as they happen.

Letter from Camm and Golian to White, February 11, 2003, Exhibits, Exh. 6, p. 1.  Golian eventually hired a white assistant to replace White.

On February 13, 2003 White took to the Brunswick police department her allegedly damaged purses, eyeglasses, shoes, repair receipts, photos of injuries, and business cards

---

[5]In another account White says that Golian told her to take leave with pay after she reported the pepper spray incident and before she returned to work after that incident.  White depo. at 117-20.

for the shops that had repaired her purses and for her hairdresser.  The police report regarding

the evidence presented by White reads in relevant part as follows:

> White showed this officer of [sic] a Polaroid picture of what she advised was her scalp.
> Upon looking at the Polaroid picture which WHITE advised was taken by personell [sic]
> at the Akron Hair Treatment Clinic [sic].  She advised that the Polaroid showed injuries
> to her head.  Upon viewing the picture I did not note any burns, bumps, or abrasions to
> her scalp.  Additionally it was difficult to make out what exactly the picture was due to
> much light exposure.
>
> White also showed this officer a pair of sun glasses that she advised that in the
> summer of 2002 subjects unknown removed a screw intentionally from the sun glasses.
> She can not provide further details.  White requested that the items that she brought to
> the BPD be photographed.  The pair of sunglasses were then photographed.  White
> also showed this officer the insoles which she advised an unknown powdery substance
> was placed on to, which caused her feet to burn.  She further advised that this unknown
> powdery substance caused discoloration to the insoles.  A photograph was taken of
> the insoles.  Upon examining the insoles there was some brown area near the front of
> the insoles, however, it could not be determined what caused the discoloration.
>
> White also showed this officer 3 different purses.  She advised that all 3 purses
> were taken to Eastwood Shoe repair to be repaired.  She advised that the total cost
> to repair the 3 purses was $6.50.  The first purse that showed this officer [sic] was a
> purple purse. This purse appeared to have been disconnected at the seam area.  It did
> not appear as though the strap was cut.  White also showed this officer a black and
> brown leather purse.  She advised that a connecting hinge made of leather was cut. [I]
> did note a small section of the leather approximately a 1/2 inch was cracked.  It was
> unknown if this piece of leather was cut or cracked under natural circumstances.  White
> then showed this officer a plastic purse which was pink, yellow, and white in color.  This
> purse also came disconnected at the seems [sic].  It did not appear as though the strap
> was cut.  The repairs to the pink, yellow, and white plastic purse and purple purse
> included re-sewing the strap area at the seams were [sic] it appeared it became
> disconnected.

Report at 20.  White testified in her deposition that she took two purses, not three, to be

repaired at the end of January 2003.  White depo. at 135-38.  A notation on the police report

indicates that the repairs were made January 31, 2003, the day after White told the police that

the purses had been taken in for repair.

White contends that Camm and Golian never asked her to provide tangible evidence to support her claims and that she repeatedly told Camm and Golian that the harassment directed toward her was motivated by race.  She also asserts that Camm & Golian had no policy in place for dealing with allegations of discrimination in the workplace.

White filed a complaint in the Medina County Court of Common Pleas on June 18, 2004.  The complaint alleges that White's discharge violated 42 U.S.C. § 1981 ("§ 1981"), Ohio Rev. Code  § 4112.2 ("§ 4112") and Ohio public policy.  The complaint also alleges that defendants negligently injured White.  Defendants removed the case to this court on July 21, 2004.  Defendants now move for summary judgment on all claims.

## II.

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U. S. 317 (1986).  The moving party must demonstrate to the court the absence of a genuine issue of material fact through reference to pleadings and discovery responses. *Id.* at 323.  The nonmoving party must then demonstrate that a material issue of fact exists for trial.  *Id.* at 324.

When a court evaluates a motion for summary judgment, "the inferences [that the court draws] from the underlying facts . . . must be viewed in the light most favorable to . . . the party opposing the motion . . . ." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962); *Aetna Ins. Co. v. Loveland Gas & Elec. Co.*, 369 F.2d 648 (6th Cir. 1966).  This means that the court must regard the

9

nonmoving party's uncontradicted allegations as true and give the benefit of the doubt to the nonmoving party's assertions when they conflict with the movant's assertions. *Bishop v. Wood*, 426 U.S. 341 (1976); *Bosely v. City of Euclid*, 496 F.2d 193, 197 (6th Cir. 1974).   T h e court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e).  *See Celotex,* 477 U.S. at 324. The nonmoving party must oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves. . . ."  *Id.* Conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).  A party cannot create a genuine issue of material fact through filing an affidavit which contradicts earlier deposition testimony.  *Reid v. Sears Roebuck & Co*., 790 F.2d 453, 460 (6th Cir. 1986).  A scintilla of evidence in favor of the nonmoving party is not sufficient.  There must be enough evidence that a reasonable jury could find for the nonmoving party.  *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989).

III.

White asserts civil rights claims pursuant to § 1981 and § 4112, a common law claim of discharge in violation of public policy, and a common law claim of negligence.

A.     *Claims brought pursuant to § 1981 and § 4112*

White alleges that she was subjected to a hostile work environment because of her race and was retaliated against for engaging in protected activity to redress her grievances.

10

Defendants deny White's allegations.

      1.     *Hostile work environment*

The Sixth Circuit generally applies Title VII, 42 U.S.C. § 2000, et seq., jurisprudence to 42 U.S.C. § 1981. Section 1981(a) states that "all persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." According to § 1981(b), the term "'make and enforce contracts' includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." The Sixth Circuit "[reviews] claims of alleged race discrimination brought under § 1981 . . . under the same standards of race discrimination brought under Title VII of the Civil Rights Act of 1964," *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

Section 4112.02(A) states that it is an unlawful employment practice "for any employer, because of race, color . . . or ancestry of any person, to discharge without just cause . . . or otherwise discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." The Ohio Supreme Court has held that "federal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128, 131 (1981).

To establish a prima facie case of hostile work environment based on race, a plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to unwelcome

11

racial harassment;  (3) the harassment was based on her race; (4) the harassment unreasonably interfered with her work performance by creating a hostile or threatening work environment; and (5) the defendant employer knew or should have known of the charged racial harassment and failed to implement prompt and appropriate corrective action. *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir. 1998); *see also Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803-04 (6th Cir. 1994).

If the plaintiff establishes a prima facie case of a hostile work environment due to the acts of a co-worker, the employer may raise an affirmative defense by demonstrating that 1) the employer exercised reasonable care to prevent and promptly correct the harassing behavior and 2) the plaintiff unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer. *Hafford v. Seidner*, 183 F.3d 506, 512-13 (6th Cir. 1999).  An employer generally exercises reasonable care to prevent harassing behavior by establishing a harassment policy and making that policy available to all employees; however, the absence of a harassment policy does not conclusively demonstrate employer negligence. *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 349 (6th Cir. 2005).[6]

In the instant case, it is evident that White is a member of a protected class and that the behavior which White alleges would suffice to interfere with work performance and create a hostile work environment if, indeed, it took place.  The court does not reach the question of whether Camm & Golian should have known of the harassment because it concludes that no reasonable jury could find that plaintiff was subject to the harassment which she alleges.

_____

[6]It is astonishing to this court that **neither** party cite the law applicable to hostile work environment.

12

Defendants base their argument that the harassment never occurred on their interviews with other office personnel, including the alleged perpetrators of the harassment and other employees, and on White's failure to produce physical evidence to support her claims of harassment.  White responds that her employers never asked her to produce physical evidence of harassment and told her to go to the police to initiate an investigation.  White produced physical evidence to the police which, she claims, support her allegations.

The evidence supporting White's version of events all comes from White: her deposition testimony, her affidavit, and her diary.  White's account is contradicted by the accounts of her co-workers.  That of itself would not be fatal to her case, as a jury could reasonably believe White's account rather that the accounts of her co-workers.

What *is* fatal to White's case is the physical evidence that White took police.  In particular, the straps of the three purses which she claims were cut by an unknown person do not support her account.  According to the report, the straps of two of the purses did not appear to have been cut, and the strap of the third purse may have been cut or may have cracked naturally.  Equally disturbing, White admits that after leaving her purses unrepaired for months she took the purses to be repaired *at the very time she also decided to raise the claims of harassment*.  That is, by her account, she more or less simultaneously decided to raise a claim of harassment and to destroy important evidence which would support that claim.  Moreover, the date on the police report indicating when the purses were repaired, January 31, 2003, was the day *after* the police had asked White to give them any physical evidence she had which would support her claim.  White did not present that evidence to the Brunswick police until February 13, 2003.  Thus the only physical evidence in the case either gives no support to

13

White's account or squarely contradicts it.

That, however, is not White's only problem.  She contradicts herself regularly. She reported one hair incident on some occasions and two hair incidents on others, two purse incidents on some occasions and three on others.  She did not consider the "office slave" comment or the butt pinching incident significant enough to report during the office meeting but now raises it as racially offensive.  Plaintiff maintains that she was attacked with pepper spray in a closed office area but neither she nor her co-workers noticed anything at the time and she noted only an itch and some redness on her neck later in the day.  That "attack" was not reported to the police for six days after it occurred.

This court takes claims of racial harassment very seriously.  Nevertheless, it requires something other than bald, unsupported, contradictory statements before permitting a plaintiff to move forward.  Because no reasonable jury could find for plaintiff on the facts before the court, the court grants defendants' motion as to plaintiff's hostile work environment claims under § 1981 and § 4112.

*2. Retaliation*

White also alleges that defendants violated § 1981 and § 4112 by firing her in retaliation for pursuing protected activity, *viz.* for pursuing her remedies for employment discrimination.  Defendants assert that White was fired for lying, defaming her co-workers, disrupting the office, and refusing to cooperate with the investigation of her charges.

Once again the court looks to caselaw applying Title VII for the applicable analysis.  A plaintiff establishes a prima facie case of retaliation by showing:

(1) she engaged in a protected activity;

14

> (2) defendant knew of the plaintiff's exercise of her civil rights;
> (3) thereafter defendant took an employment action adverse to plaintiff; and
> (4) there was a causal connection between the protected activity and the adverse employment action.

*Singfield v. Akron Metro. Housing Auth.,* 389 F.3d 555, 563 (6th Cir. 2004). Once the plaintiff establishes a prima facie case of retaliation, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Canitia v. Yellow Freight Sys.*, 903 F.2d 1064, 1066 (6th Cir. 1990). The burden then shifts back to the plaintiff to demonstrate that the proffered reason is a pretext. *Id.* Plaintiff may demonstrate that the proffered reason is a pretext by any of three methods: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the] discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis omitted). In the instant case, White has established a prima facie case. She engaged in protected activity when she filed a charge with the OCRC, defendants knew of White's exercise of her civil rights, defendants afterward took an employment action adverse to White, and there is sufficient evidence in the timing of her firing and the letter of dismissal from which a reasonable jury could find a causal connection between the protected activity and the adverse employment action. Defendants respond by articulating a legitimate, nondiscriminatory reason for their actions, *viz.* that White abused the process for addressing legitimate grievances of racial discrimination by defaming her co-workers and disrupting their employer's place of business.[7]

---

[7]An employer may not discharge an employee for making accusations of discriminatory acts against co-workers which are later determined to be insufficient to sustain an action for discrimination or are determined to be motivated by something other than a

White does not respond to defendants' assertion of a legitimate business reason for her termination in the portion of her brief devoted to her retaliation claim. Elsewhere in her brief, however, White argues that the circumstances surrounding her firing demonstrate that the reasons proffered for her discharge did not actually motivate her firing. White argues as follows:

> [T]he defendants *admit* that the African-American Plaintiff, Charnae White, was fired for identifying on-going race-based harassment at a staff meeting. This admission constitutes an unambiguous demonstration, by direct evidence, the defendants used an "illegitimate criterion" as a "substantial factor" in the decision to fire Charnae White. Plaintiff has testified her prior effort to address and correct on-going race-based harassment with defendants Camm and Golian (even in the admitted absence of a policy or procedure for same) not only *did not* help the situation, but made it *worse*. Ms. White's assertions have been met by defendants' claim that they had *no idea* Ms. White was experiencing discrimination. Quite apart from the credibility issue raised by defendants' simultaneous claim that they *did not know*, defendants' contention that Ms. White was fired because her claim of discriminatory treatment was "disruptive" to the dental office and caused "low morale" belies their simultaneous assertion that, had they known that Plaintiff believed she was being discriminated against, defendants would have done something. These inherently inconsistent positions both raise a classic credibility issue for the jury and . . . present an opportunity to inform defendants that their failure to put into place the complaints cannot, later, be used as a shield to a claim of same. Not only is ignorance *not* a defense, but Plaintiff's plain testimony establishes that defendants *knew* about her belief that she was being discriminated against, *failed* to take investigative or corrective action and then *fired her for bringing her complaints before the sole known forum for resolving employee concerns*.

Plaintiff. opp. at 11-12.

_____

discriminatory animus. As White notes, a "reasonable and sincere" belief that one is suffering from discrimination may not be retaliated against, even if that belief turns out to be mistaken. *See* Pl. opp. at 15-16 (citing *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304 (6th Cir. 1989). But this is not what defendants claim to be the reason for White's firing. Rather, they allege that White fabricated at least some of the incidents of which she complains, thus defaming her co-workers and interrupting the business of the office.

White's somewhat incoherent argument misstates the record and misstates defendants' assertions.  First, the record clearly shows that White did *not* identify "on-going race-based harassment at a staff meeting."  White repeatedly stated that when she was asked at the January 28, 2003 staff meeting and in her interview with Camm and Golian after the staff meeting why her co-workers were harassing her she said that the motive was jealousy, not race-based prejudice.  *See* White depo. at 109, 110-12.  Indeed, White has explicitly testified that even by late January 2003 she had not told her employers that she believed the alleged harassment against her was racially motivated.  *Id.* at 77.  By White's own account, the earliest defendants could have known that White believed that the alleged harassment was racially motivated was when they learned that White had complained to the Brunswick police about ethnic intimidation.

Second, White contradicts the record when she asserts that she brought to defendants attention more than once even a suggestion of office behavior motivated by racial animus.  The record clearly shows just one instance in which White raised anything resembling a claim of racial harassment, her discussion with Camm after the "office slave" remark.  White testified regarding that discussion as follows:

> Q: As I understand how this came about, I believe you said that you had reported what you had over heard to Linda Hansen; is that right?
> A: Yes.
> Q: And Linda Hansen was one of Dr. Camm's dental assistants?
> A: Yes.
> Q: But when she made that report that was outside of your hearing, wasn't it?
> A: Yes.
> Q: You weren't present when Linda said whatever she said to Dr. Camm about what had happened that you overheard; is that right?
> A: Right.
> Q: And then I think you said that Dr. Camm came and got you and Linda came

17

along with you to his office, correct?
A: Right.
Q: Tell me everything that you said to Dr. Camm in Dr. Camm's office, before he showed the picture.
A: I told him how I felt about what was said.  That's when he showed me the picture on the wall.  We didn't stay there long.

White depo. at 55-56.  White then testified that she did not again approach either Camm or Golian with complaints about harassment, racially-motivated or otherwise, before the January 28, 2003 staff meeting.

Third, there is no evidence in the record that White's brief discussion with Camm somehow caused White's situation to worsen.  Indeed, there is no evidence in the record that anyone knew of that meeting other than White, Hansen, and Camm.

Fourth, White contradicts the record when she asserts that defendants failed to investigate her claims.  She admits that defendants interviewed her after the January 28, 2003 staff meeting, Golian asked her to go into her accusations in more detail, he took notes about what he said, and he told her that he would check into her allegation and get back to her.  She does not deny that defendants interviewed all their employees regarding her claims, including Mace and Edmisten.  Deposition of Golian, Exhibits, Exh. C, pp. 30-31.  Nor does she deny that defendants told her to report immediately any future instances of harassment and investigated her allegation that she had been sprayed on February 4, 2003 by cancelling all patient appointments and re-interviewing their other employees.  *Id.* at 40.

Finally, White misstates defendants' reasons for firing her.  They did not claim to have fired her "for identifying on-going race-based harassment at a staff meeting."  They fired her because after investigating her claims they concluded that she lied, defamed her co-workers,

disrupted the office, and showed no signs of ceasing this behavior.

White fails to show that the circumstances surrounding her firing demonstrate that the reasons proffered for her discharge did not actually motivate her firing.  Consequently, she is unable to show that defendants' legitimate business reasons for firing her are mere pretext. For this reasons her claim for retaliation fails.

### B. Alleged Violation of public policy

White also asserts a state claim in tort that defendants discharged her in violation of Ohio's public policy.  Defendants respond that White's claim is without merit and that a claim in tort for discharge in violation of public policy is preempted by Ohio's Civil Rights Statutes.

White seeks relief pursuant to *Greeley v. Miami Valley Maintenance Contractors., Inc.*, 49 Ohio St. 3d 228, 233-34, 551 N.E.2d 981, 986 (1990).  In that case the Ohio Supreme Court held the following:

> 1. Public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute. (R.C. 3113.213[D], construed and applied.)

> 2. Henceforth, the right of employers to terminate employment at will for 'any cause' no longer includes the discharge of an employee where the discharge is in violation of a statute and thereby contravenes public policy. (Fawcett v. G.C. Murphy & Co. [1976], 46 Ohio St.2d 245, 75 O.O.2d 291, 348 N.E.2d 144, modified.)

> 3. In Ohio, a cause of action for wrongful discharge in violation of public policy may be brought in tort.

*Greeley*, 49 Ohio St. 3d at 233-34, 551 N.E.2d at 986 (syllabus by the court).  The court subsequently recommended a framework for analyzing the *Greeley* exception in particular cases:

19

In reviewing future cases, Ohio courts may find useful the analysis of Villanova Law Professor H. Perritt, who, based on review of cases throughout the country, has described the elements of the tort as follows:

"1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

4. The employer lacked overriding legitimate business justification for the dismissal (the overriding *justification* element)." (Emphasis *sic.*)

*Painter v. Graley*, 70 Ohio St.3d 377, 384 n.8, 639 N.E.2d 51, 57 n.8 (1994)(quoting *H. Perritt,*

*The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U.

Cin. L. Rev. 397, 398-399 (1989). In *Collins* v. *Rizkana*, 73 Ohio St. 3d 65, 69-70, 652

N.E.2d 653, 657-58 (1995), the court noted that "the clarity and jeopardy elements, 'both of

which involve relatively pure law and policy questions,' are questions of law to be determined

by the court. 'The jury decides factual issues relating to causation and overriding justification.'

" (Quoting *Perritt,* 58 U. Cin. L. Rev. at 398-399).

The question of the relationship between *Greeley* torts and statutory violations has been

explored by Ohio courts. In *Painter* and *Collins* the court soundly rejected the doctrine that the

*Greeley* public-policy exception to the employment-at-will doctrine applies only in cases

involving a statutory violation. In *Helmick v. Cincinnati Word Processing, Inc.*, 45 Ohio St. 3d

131, 131, 543 N.E.2d 1212, 1213 (1989), a case in which plaintiff brought causes of action

20

for sexual harassment pursuant to § 4112 and pursuant to *Greeley*, the court found:

> 1. R.C. Chapter 4112 was intended to add protections for victims of sexual harassment rather than reduce the protections and remedies for such conduct.
>
> 2. Allowing a plaintiff to pursue common-law remedies in lieu of the relief provided under R.C. Chapter 4112 creates no conflict and serves to supplement the limited protection and coverage of that chapter.

(syllabus by the court).

The *Collins* court held that "a cause of action may be brought for wrongful discharge in violation of public policy based on sexual harassment/discrimination." *Collins*, 73 Ohio St. 3d at 65, 652 N.E.2d at 654-55 (syllabus by the court). The court allowed the public policy tort to proceed even though a § 4112 remedy was not available to plaintiff (the employer hired too few employees to come under the strictures of § 4112). The court also observed:

> The issue that most often arises under the jeopardy analysis, and upon which the courts are split, is whether the public policy tort should be rejected where the statute expressing the public policy already provides adequate remedies to protect the public interest. This issue is oftentimes complicated by virtue of the fact that courts confuse it with the issue of preemption.

*Collins*, 73 Ohio St. 3d at 73, 652 N.E.2d at 660 (citations omitted). The court noted that "the issue of adequacy of remedies is confined to cases '[w]here right and remedy are part of the same statute which is the sole source of the public policy opposing the discharge.'" *Id.* (quoting *Watson v. Peoples Sec. Life Ins. Co.*, 322 Md. 467, 486, 588 A.2d 760, 769 (1991)). The court then held that "[i]n cases of multiple-source public policy, the statute containing the right and remedy will not foreclose recognition of the tort on the basis of some other source of public policy, unless it was the legislature's intent in enacting the statute to preempt common-law remedies." *Collins*, 73 Ohio St. 3d at 73, 652 N.E.2d at 660.

21

Many of the remaining unresolved issues regarding *Greeley* torts were resolved by *Kulch v. Structural Fibers, Inc.*, 78 Ohio St. 3d 134, 677 N.E.2d 308 (1997).  That court reaffirmed the four part analysis stated in *Painter* and affirmed in *Collins*.  The court found the policy element satisfied.  Then, in turning to the jeopardy element, it observed that

> [*Greeley* does not apply] only in cases where an employee is discharged or disciplined for a reason prohibited by a statute that provides the employee no specific remedy. . . . The syllabus in *Greeley* does not say that.  *Greeley* and its progeny stand for the proposition that, in Ohio, the judicially recognized doctrine of employment at will has certain limitations.  One of those limitations is that the doctrine will not be followed in cases where an at-will employee is discharged or disciplined for a reason that violates a statute and thereby contravenes public policy.  *Greeley*, supra, paragraphs one and two of the syllabus.  The syllabus in *Greeley* makes no exception for statutes like R.C. 4113.52 that contain remedial provisions.  That, of course, was no mistake.  The *Greeley* public-policy exception to the doctrine of employment at will was not intended to apply only where a statute provides no civil remedies.  Rather, *Greeley* and its progeny are intended to bolster the public policy of this state and to advance the rights of employees who are discharged or disciplined in contravention of clear public policy. Accord *Amos v. Oakdale Knitting Co.* (1992), 331 N.C. 348, 356, 416 S.E.2d 166, 171 (holding that a public-policy exception to the employment-at-will doctrine adopted by the North Carolina Supreme Court in *Coman v. Thomas Mfg. Co.* [1989], 325 N.C. 172, 381 S.E.2d 445, was "not just a remedial gap-filler.  It is a judicially recognized outer limit to a judicially created doctrine, designed to vindicate the rights of employees fired for reasons offensive to the public policy of [North Carolina].  The existence of other remedies, therefore, does not render the public policy exception moot.").

*Kulch*, 78 Ohio St. 3d at 155, 677 N.E.2d at 324.  The court concluded, "[T]he mere existence of statutory remedies in R.C. 4113.52 does not, without more, operate to bar recognition of appellant's *Greeley* claim for tortious wrongful discharge in violation of R.C. 4113.52." *Id.*, 78 Ohio St. 3d at 156, 677 N.E.2d at 324, *aff'd by Livingston v. Hillside Rehab. Hosp.,* 79 Ohio St. 3d 249, 680 N.E.2d 1220 (1997).

The Ohio Supreme Court narrowed the holding in *Kulch* in *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 773 N.E.2d 526 (2002).  Plaintiff filed claims based on the federal Family

and Medical Leave Act ("FMLA") and *Greeley*.  The court stated:

> An analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful-discharge claim.  Where, as here, the sole source of the public policy opposing the discharge is a statute that provides the substantive right *and* remedies for its breach, "the issue of adequacy of remedies" becomes a particularly important component of the jeopardy analysis.  "If the statute that establishes the public policy contains its own remedies, it is less likely that tort liability is necessary to prevent dismissals from interfering with realizing the statutory policy."  Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.  In that situation, the public policy expressed in the statute would not be jeopardized by the absence of a common-law wrongful-discharge action in tort because an aggrieved employee has an alternate means of vindicating his or her statutory rights and thereby discouraging an employer from engaging in the unlawful conduct.

*Wiles*, 96 Ohio St. 3d at 244, 773 N.E.2d at 531.  The court found that the FMLA provided adequate relief to plaintiff and concluded that plaintiff could not bring a *Greeley* claim in addition to a claim brought pursuant to the FMLA, which provided back pay, reinstatement, and attorney fees.  The court noted that *Greeley* allowed the possibility that a plaintiff might receive punitive damages while the FMLA did not, but it observed:

> While the FMLA may not (as the law stands today) allow punitive damages . . . the absence . . . does not render the statutory remedies inadequate.  For one thing, the question whether punitive damages are recoverable is irrelevant to any discussion of whether the statutory remedies provide something close to make-whole tort relief.  Punitive damages are designed not to compensate the plaintiff but, rather, to punish the defendant and deter future wrongdoing.  The remedies that the FMLA provides . . . are broad enough in their own right to compensate an aggrieved employee for an employer's violation of the Act.  There is accordingly no need to create by judicial fiat further remedies by way of a *Greeley* claim when the FMLA provides reasonably satisfactory ones.

*Wiles*, 96 Ohio St. 3d at 248, 773 N.E.2d at 534.

The Ohio Supreme Court has not ruled as to whether a remedy in tort pursuant to

*Greeley* is available when a plaintiff pursues a remedy provided by § 4112. Ohio's appellate

courts generally do not allow a plaintiff to pursue both remedies:

> Some of Ohio's appellate courts have interpreted *Collins* and *Wiles* to mean that a plaintiff cannot assert a claim of wrongful discharge in violation of public policy when the tort claim is based solely on a violation of R.C. 4112.02: *Barlowe v. AAAA Internatl. Driving School, Inc.,* 2d Dist. No. 19794, 2003-Ohio-5748, 2003 WL 22429543 (there is no common-law claim of wrongful discharge based solely on a violation of R.C. 4112.02; the statute provides adequate remedies; "jeopardy" element cannot be satisfied); *Berge v. Columbus Community Cable Access* (1999), 136 Ohio App.3d 281, 736 N.E.2d 517 (10th District Court of Appeals; the remedies available under R.C. 4112.02 were adequate, precluding additional claim of wrongful discharge in violation of public policy).
>
> Many appellate districts have also held that a wrongful-discharge claim based on a violation of R.C. 4112.02 must fail if the plaintiff does not establish a violation of R.C. 4112.02: *Vitatoe v. Lawrence Industries, Inc.,* 153 Ohio App.3d 609, 2003-Ohio-4187, 795 N.E.2d 125 (8th District Court of Appeals; without proof of a violation of R.C. 4112.02, there is no proof that public policy has been violated); *Pflanz v. Cincinnati,* 149 Ohio App.3d 743, 2002-Ohio-5492, 778 N.E.2d 1073 (1st District Court of Appeals; wrongful-discharge claim fails because plaintiff was not in class of people protected by R.C. 4112.02; "clarity" element not proven); *Ferraro v. B.F. Goodrich Co.,* 149 Ohio App.3d 301, 2002-Ohio-4398, 777 N.E.2d 282 (9th District Court of Appeals; employee who bases wrongful-termination claim on violation of R.C. 4112.02 must strictly comply with the statute); *Cochran v. Columbia Gas of Ohio, Inc.* (2000), 138 Ohio App.3d 888, 742 N.E.2d 734 (10th District Court of Appeals; plaintiff did not identify any clear public policy other than R.C. 4112.02, and wrongful-discharge claim must fail if R.C. 4112.02 claim fails).

*Bicudo v. Lexford Props., Inc.*, 157 Ohio App. 3d 509, 526, 812 N.E.2d 315, 328-29 (2004)

In the instant case, White has failed to establish a violation of § 4112. Thus, either

because she has not satisfied the jeopardy element of the *Greeley* tort or because she has

failed to establish a violation of § 4112, this court concludes that under Ohio law she cannot

pursue a remedy in tort for discharge in violation of public policy. For this reason, the court

grants defendants' motion for summary judgment on plaintiff's public policy claim.

24

*C. Alleged negligence*

White also claims that she was injured because of defendants' negligence. Defendants argue that White is unable to satisfy the elements of negligence, particularly the element of foreseeability. White responds that defendants had a clear legal duty to prevent, stop, investigate, and correct any workplace harassment.

Ohio law imposes negligence on employers in certain circumstances for the wrongful acts of their employees:

> The party seeking to prevail on a claim for the negligent hiring, supervision and retention of an employee by an employer must show: "'(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries.'" *Ruta v. Breckenridge-Remy Co.* (Dec. 12, 1980), Erie App. No. E-80-39, unreported." . . . "An employer may be negligent if he knew, or should have known, that his employee had a propensity for violence and that the employment might create a situation where the violence would harm a third person." *Staten v. Ohio Exterminating Co., Inc.,* (1997) Ohio App. 3d 526, 530, 704 N.E.2d 621, 624. "'The foreseeability of a criminal act depends upon the knowledge of the defendant, which must be determined by the totality of the circumstances, and it is only when the totality of the circumstances are "somewhat overwhelming" that the defendant will be held liable.'" . . . . In the absence of a "known criminal propensity," a criminal act by an employee is not reasonably foreseeable. *Peters v. Ashtabula Metro. Hous. Auth.* (1993), 89 Ohio App. 3d 458, 462, 624 N.E.2d 1088, 1091.

*Steppe v. K-Mart Stores,* 136 Ohio App. 3d 454, 465-466, 736 N.E.2d 58, 66-67 (1999).

Even if this court were to assume that the acts which White alleges actually occurred, White has not shown that defendants should have foreseen the alleged criminal acts of their employees. Mace and Edmisten were longtime employees with no known history of any

workplace problems.  White worked at the office for months before reporting any incident.  The Brunswick Police Department was unable to confirm any criminal activity.  Certainly White has not established knowledge and foreseeability by the "somewhat overwhelming" totality of circumstances necessary to hold defendants liable.  For this reason, White's cause of action for employer negligence must fail.

IV.

For the above stated reasons, defendants' motion for summary judgment is granted in its entirety.

IT IS SO ORDERED.


Dated: September 12, 2005                    s:\Patricia A. Hemann
                                            Patricia A. Hemann
                                            United States Magistrate Judge

26